**METRO ALLIED INSURANCE AGENCY, INC. and C. Michael McGlothlin, Petitioners,**

v.

**Shihche E. LIN, Individually and d/b/a Aptus Company, and Sung–Ping H. Lin, Respondents.**

No. 07–1032.

Supreme Court of Texas.

Dec. 11, 2009.

Rehearing Denied Feb. 12, 2010.

David W. Holman, The Holman Law Firm, P.C., Daniel W. Burrows, Daniel R. Dutko, Burck Lapidus & Lanza, PC, Houston, for Petitioners.

Richard N. Countiss, Countiss Law Firm, Houston, for Respondents.

PER CURIAM.

At issue in this case is whether the causation standard for a claimed failure to procure insurance under a negligence theory and under the Texas Deceptive Trade Practices Act (DTPA) requires proof of the availability of some insurance that would have covered the plaintiff's damages. In a memorandum opinion, the court of appeals held that such proof was not required and reversed the trial court's take-nothing judgment notwithstanding the verdict.

305 S.W.3d 1. We reverse the judgment of the court of appeals.

The United States government awarded Shihche Lin, an electrical engineer, a contract to perform work on a hydroelectric plant in Michigan. The contract required Lin to provide a performance bond and to procure commercial general liability (CGL) insurance. Lin purchased the bond from a surety company and obtained quotes for CGL insurance from two insurance agencies—Metro Allied Insurance,[1] through its agent Michael McGlothlin (collectively, Metro), and Elbert Insurance. Lin testified that he obtained the Elbert quote because he did not feel comfortable with the original quote from McGlothlin as it lacked detail. Lin forwarded the Elbert quote to McGlothlin as an example of the type of coverage he sought. Metro claims that the Elbert quote is indecipherable, but Lin claims that the insurance quoted would have provided coverage for the breach of contract claims against him.

The Elbert quote contained a section with a subhead "CONDITIONS" under which terms such as "explosion," "underground," and "host liquor" are listed. In addition, it lists "CONTRACTUAL" with an "X" marked next to it. Lin testified, "X meaning that this will be covered." After receiving the Elbert quote, McGlothlin advised Lin of the premium amount for the coverage, and Lin began paying premiums to McGlothlin. However, it is undisputed that Metro failed to write or procure a CGL policy for Lin.

The federal government later terminated Lin's contract and required Lin's surety company to complete the contract under the performance bond. To recoup the money it spent to complete the contract, the surety company sued Lin in November 2000. Lin appeared pro se, but later asked Metro to provide him with an attorney. McGlothlin repeatedly assured him that a CGL policy was in place and that a lawyer would be provided to Lin to assist in his defense under Lin's CGL policy. In 2002, McGlothlin discovered that no policy existed and reported the situation to Metro's errors and omissions insurer. Metro's errors and omissions insurance company refused to defend Lin, and Metro did not provide a defense for Lin in the suit filed by Lin's surety company. Lin continued his pro se defense and eventually settled the lawsuit for $175,000, which was less than the surety company had paid to the federal government after it terminated Lin's contract.

Lin subsequently sued Metro for negligence and a violation of the DTPA for failure to procure a CGL policy, claiming that the surety company's suit against him would have been covered by a CGL policy and that he would not have had to settle the surety company's lawsuit if Metro had procured an insurance policy as it contracted to do. At trial, Lin did not present any evidence of the typical terms or coverage in a CGL policy issued by an insurance company utilized by Metro, any evidence that a typical CGL policy would provide coverage for breach of an indemnity agreement under a performance bond, or any

---

1. Metro Allied is an independent insurance agency, run by McGlothlin, that contracts with a number of insurance companies to provide coverage for its clients. To procure an insurance policy like the kind needed by Lin, McGlothlin would contact a "managing general agent," a person usually representing eight to ten different insurance companies, for quotes, or "indications." Then, to procure the policy, McGlothlin would contract with the managing general agent offering the best price. Rather than "direct bill" insurers like Aetna, Travelers Insurance, or Safeco for policies such as Lin's, Metro Allied would bill Lin, Lin would pay Metro Allied, and Metro Allied would then pay the managing general agents, which have open accounts with Metro Allied.

expert testimony opining on the scope of coverage for an indemnity claim under a surety bond in a typical CGL policy. Rather, Lin merely argued that he requested a CGL insurance policy that included "CONTRACTUAL" as one of its covered "CONDITIONS."

Metro acknowledges the failure to procure a CGL policy for Lin and that this failure to procure the policy was negligent. However, Metro disputes that the negligence caused Lin any damages. In this suit, the jury awarded damages against "Metro and/or McGlothlin" of $175,000 for negligence, actual damages of $200,000 under the DTPA, and additional damages of $300,000 for knowingly violating the DTPA. The trial court, however, granted Metro's motion for judgment notwithstanding the verdict and rendered a take-nothing judgment in favor of both Metro Allied and McGlothlin, holding that Lin failed to prove causation under either theory. The court of appeals reversed, holding that sufficient evidence supported the findings that Metro Allied, through its agent, McGlothlin, knowingly engaged in unconscionable conduct that was the producing cause of Lin's damages under the DTPA. The court of appeals further stated that for Lin to recover, he "is not required to 'prove a specific policy in order to show that he was adversely affected' by the failure of the insurance agent to obtain the policy." 304 S.W.3d at 835 (citing *Parkins v. Tex. Farmers Ins. Co.*, 645 S.W.2d 775, 776 (Tex.1983)).

Metro petitioned this Court for review, arguing that both the negligence and DTPA theories require proof of some CGL policy that would have covered the damages, as necessary causation evidence, and that Lin provided no such evidence. Lin agrees that his negligence theory requires such proof, but argues that the DTPA theory does not. He further argues that, even if both theories require this proof of causation, he provided legally sufficient evidence to uphold the jury's verdict. Because the parties agree that the negligence theory requires proof that some insurance policy would have covered the losses in question, we begin with an analysis of whether the DTPA likewise requires such proof.

In 1979, the Legislature amended the provision in the DTPA to change the causation standard from "adversely affected" to the current "producing cause" standard. TEX. BUS. & COM. CODE § 17.50; *Jacobs v. Danny Darby Real Estate, Inc.*, 750 S.W.2d 174, 176 (Tex.1988) (Kilgarin, J., concurring) (discussing the amendment). Absent other guidance from the Legislature indicating the effective date of an amendment, the date the allegedly deceptive act or practice occurred determines which version of the DTPA applies. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 566 (Tex.1984). Because the misrepresentations in this case occurred over a period of time in the late 1990s, the "producing cause" standard in the current version of the DTPA controls the resolution of this case. TEX. BUS. & COM. CODE § 17.41, *et. seq.* That standard requires proof that the act was a substantial factor in bringing about the injury, without which the injury would not have occurred. *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 481 (Tex. 1995) (defining "producing cause" under the DTPA); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex.1995) (same). We have previously endorsed this for the DTPA's "producing cause" standard. In *Hurst v. Sears, Roebuck & Co.*, the Court held that because the misrepresentations in the case arose before the 1979 amendment, the controlling version of the DTPA required that the consumer prove he or she had been

"adversely affected" by the defendant's actions. 647 S.W.2d 249, 252 (Tex.1983). However, the trial court mistakenly submitted a "producing cause" issue to the jury because the case went to trial after the 1979 amendments. *Id.* We held that the mistake was not reversible error because "the jury's affirmative findings on the producing cause issues were sufficient to satisfy the statute's requirement that Hurst be adversely affected by Sears' conduct," thereby implicitly holding that the "producing cause" standard encompassed the lesser, "adversely affected" standard. *Id.* at 252–53.

Our previous opinions addressing the evidence required to prove causation in a failure to procure insurance case involved conduct that arose prior to the 1979 amendments and thus was governed by the "adversely affected" causation standard. *See Parkins,* 645 S.W.2d at 776; *Hurst,* 647 S.W.2d at 251; *Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688, 694 (Tex.1979). In *Royal Globe,* we held that the injury to Bar Consultants was that it "believed it was covered by a policy of insurance from any loss caused by vandalism when it was not so covered." *Id.* at 694. We later said in *Parkins v. Texas Farmers Insurance Co.,* that a plaintiff "need not prove a specific policy in order to show that he was adversely affected by Farmers' conduct." *Parkins,* 645 S.W.2d at 776. In other words, under the "adversely affected" standard, plaintiffs only needed to prove that the insurer's authorized agent represented there was insurance coverage when there was none, rather than that the terms of another specific policy would have covered the plaintiff's damages. *See id.*

■ In this case, after *Hurst,* we clarify the proof required under the amendment to the DTPA's 1979 causation standard. The material change in the statutory language indicates a legislative intent to create a different standard. *Indep. Life Ins. Co. of Am. v. Work,* 124 Tex. 281, 77 S.W.2d 1036, 1039 (1934) ("The rule is elementary that we must give some effect to changes in the words of legislative acts, and must also construe their words, so as to accomplish the legislative intent."). The Legislature's amendment of the causation standard in the DTPA to "producing cause" establishes a higher standard for proof of causation in cases brought under the DTPA, including failure to procure insurance cases. *See* Tex. Bus. & Com. Code § 17.50. Further, as we suggested in *Hurst,* the current standard requires more than simply a misrepresentation of coverage, which was the requirement under the "adversely affected" standard. 647 S.W.2d at 252–53.

■ Both producing cause and proximate cause contain the cause-in-fact element, which requires that the defendant's act be "a substantial factor in bringing about the injury and without which the harm would not have occurred." *Boys Clubs of Greater Dallas,* 907 S.W.2d at 481; *accord IHS Cedars v. Mason,* 143 S.W.3d 794, 799 (Tex.2004) (discussing the cause-in-fact element); *see also Ford v. Ledesma,* 242 S.W.3d 32, 46 (Tex.2007) (defining "producing cause" in a products liability action as "being a substantial factor in bringing about an injury, and without which the injury would not have occurred"). In this context, the harm would have occurred only if the CGL insurance that Metro agreed to procure would have actually covered the injury suffered by Lin. Otherwise, Lin would have obtained an insurance policy that did not provide coverage for his surety's claims against him, and the injury would have been the same regardless of whether Metro procured the insurance or not. Therefore, the more stringent causation standard of the

current DTPA statute requires proof that the coverage sought was actually available in a CGL policy, as sought by Lin. *See Stinson v. Cravens, Dargan & Co.,* 579 S.W.2d 298, 299–300 (Tex.Civ.App.-Dallas 1979, no writ) (holding that where a duty to obtain specified insurance coverage exists, a plaintiff must prove "that the loss is one insured against in some policy"). This departure from the standards articulated in *Parkins* and *Royal Globe,* if not compelled by logic, is required by the 1979 amendments to the DTPA and is consistent with an established line of authority from other states. *See, e.g., Johnson & Higgins of Alaska Inc. v. Blomfield,* 907 P.2d 1371, 1374 (Alaska 1995) (holding that plaintiffs satisfied a burden to show that "coverage was commercially available for the loss sustained" and noting that such a burden "seems to be the majority rule" (citations omitted)); *Bayly, Martin & Fay, Inc. v. Pete's Satire, Inc.,* 739 P.2d 239, 244 (Colo.1987) ("The law is well established that the plaintiff must show by a preponderance of the evidence that other insurance could have been obtained." (quoting *Heller–Mark & Co. v. Kassler & Co.,* 37 Colo.App. 267, 544 P.2d 995, 997 (1976), and citing cases from Kansas, New York, Texas, Washington, and Wisconsin)).

 Because both producing cause and proximate cause require proof that a CGL insurance policy would have covered the damages, we consider whether Lin submitted legally sufficient evidence to carry his burden. *See Boys Clubs of Greater Dallas,* 907 S.W.2d at 477, 481; *see also Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 582 (Tex.2007) (stating that proximate cause requires proof of cause in fact). Lin produced no CGL insurance contract that provides coverage of his breach of contract damages that would have been, or normally was, sold by Metro; no CGL insurance agree-

ment available in the market that would have provided coverage for the claims against him; nor even any expert testimony regarding coverage for indemnity claims under a surety bond in a typical CGL policy. Instead, Lin points only to his testimony that McGlothlin told Lin that the CGL policy McGlothlin believed was issued would cover the claims. McGlothlin testified that he never made any specific assurances as to what the putative policy covered, but that it would include "standard CGL coverages." However, even accepting Lin's characterization of McGlothlin's assurances as true, Lin is required to present legally sufficient evidence that the coverage he sought is obtainable to surmount the causation hurdle. The law is clear that misrepresentations about insurance coverage cannot, under the doctrine of estoppel, expand coverage provided in an insurance policy. *See, e.g., Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778–80 (Tex.2008); *Tex. Farmers Ins. Co. v. McGuire,* 744 S.W.2d 601, 602–03 (Tex. 1988); *Wash. Nat'l Ins. Co. v. Craddock,* 130 Tex. 251, 109 S.W.2d 165, 166–67 (Tex. Com.App.1937). An insurance agent's independent representations may affect his responsibilities to his client, but they cannot add to or alter the coverages of any insurance contract or provision. *Int'l Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546 (Tex.1973). Therefore, Lin's testimony regarding McGlothlin's statements about coverage is no evidence that a contract, had one existed, would actually have covered his damages. There must be proof of an insurance policy that would cover the alleged injury.

 Lin also asserted that the Elbert quote and McGlothlin's testimony as to its meaning were evidence of the coverage he sought. Elbert Insurance sent the quote to Lin in response to Lin's request for a CGL policy quote; Lin then forward-

ed the quote to McGlothlin as evidence of the type of CGL policy he sought. McGlothlin, after stating that it is the insurance company that determines the language used in an insurance policy, that he is not qualified to interpret policies, and that coverage varies from company to company, testified as follows to his understanding of the meaning the "X" marked next to "CONTRACTUAL" under the "CONDITIONS" subhead in the Elbert quote:

Q: What does that mean to you when you see that?

A: Contractual liability.

Q: Can you describe the content and the nature of contractual liability?

A: Contractual liability, as I understand it, is if you were to violate a provision of—a legal provision of a contract. But to my understanding it also does not cover performance on a contract.

Q: The contractual portion, was it your understanding it's the coverage of contractual liability when a contractor failed to meet a provision of the contract? Was that your understanding?

A: It would not—again I'm not an expert, but if you—if the coverage was that broad, he wouldn't have to have performance bonds, all you would have to have would be contractual liability and companies would not accept exposure based on my experience of performance or nonperformance on a contract and instead give you an endorsement to the policy on contractual liability ... [which] would require you to have a performance bond which would not be the same thing as contractual coverage on the insurance policy.

Q: How often did you see in early 1999 and 2000 ... a contractual liability included in a CGL policy?

A: That would be fairly rare.

Q: But it did happen, was it your understanding?

A: Down in the quotation here it says contractual, yes.

McGlothlin testified that CGL policies may cover contractual liability for damages, but not performance or nonperformance of work. McGlothlin never opines that any contractual endorsement would have covered, or that he could have procured a policy that covered, Lin's nonperformance on the construction contract from any of the insurers contracting with Metro. Neither Elbert's agents nor any expert in insurance provided any testimony explaining what the Elbert quote covered. In fact, McGlothlin was the only witness presented by either side who had some knowledge of insurance, and he both disclaims being an expert on insurance coverage and expressed his understanding that contractual coverage under a CGL policy does not cover performance under a contract. Viewing this evidence to indulge all reasonable inferences in favor of the jury's verdict, *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005), at best, a jury could draw two equally compelling inferences from the Elbert quote—that coverage for breaches of contract was excluded or included in the policy—because "CONDITIONS" could mean those that are covered or those that are not. *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984) ("When circumstances are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be inferred."); *see also Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex.2001) (Phillips, C.J., concurring in part and dissenting in part) (discussing the history and application of

the equal inference rule). Because the only evidence presented was McGlothlin's testimony based on an unclear quote from Elbert, the jury would have to guess about a vital fact. Therefore, the Elbert quote, and McGlothlin's interpretation thereof, provide no evidence of causation. *See Litton Indus.*, 668 S.W.2d at 324.

In sum, the only evidence from the trial regarding the insurance coverage Metro was to provide was McGlothlin's testimony that contractual liability coverage is "rare," that "violat[ing] a legal provision of a contract" is covered, but "performance on a contract" is not, and that providing CGL insurance that would have satisfied the Elbert quote likely provide some type of contractual coverage. The court of appeals held that this is evidence of "some" policy that would cover the claim. On the contrary, Lin did not present any evidence showing any CGL policy would have covered the loss he sustained. The mere fact that *some* CGL policies rarely cover losses related to *some* types of contractual liability is no evidence that CGL insurance Metro could have procured (or that Lin could have procured himself had Metro not assured him that he was covered) would cover the loss sustained by Lin.

Because Lin brought forth no evidence of cause in fact as required to prevail under both his negligence and DTPA claims, we reverse the court of appeals and remand the case to the trial court to reinstate the judgment notwithstanding the verdict.